FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

98 NOV -4  PM 2: 33

U.S. DISTRICT COURT
N.D. OF ALABAMA

TAMMY F. SEXTON                  )
                                 )
        Plaintiff,               )
                                 )        CASE NO:
v.                               )
                                 )        CV-98-PT-90M
BANKS, WEAVER & YOUNG            )
INSURANCE COMPANY and            )
TERRY E. YOUNG                   )
                                 )
        Defendants.              )

ENTERED

NOV 4 = 1998

## MEMORANDUM OPINION

This cause comes to be heard on defendants' Motion For Summary Judgment filed on September 10, 1998. The court has applied but will not repeat the well known summary judgment standards.

### I. Background and Summary of the Action

On January 14, 1998, plaintiff Tammy Sexton filed an action against Terry Young, the President of Banks, Weaver & Young, Inc. ("BWY"), and BWY. The complaint alleges that both Young and BWY are liable for engaging in, tolerating or failing to prevent sexual harassment, for discriminatory discharge under Title VII, for retaliatory discharge under Title VII, and for state law claims of outrage and intentional infliction of emotional distress. Additionally, the complaint contains counts for breach of contract and negligent supervision against BWY, and battery against Young.

### II. Factual Allegations

#### A. Plaintiff[1]

Tammy Sexton began employment with BWY as a Customer Service Representative in July of 1994 and was promoted to manager of the company's insurance department in 1995. She remained in the position of manager until she was fired by Terry Young on October 29, 1997. Terry Young was President

---

[1] These "facts" are stated favorably to the plaintiff and may or may not be the actual facts.

of BWY and Sexton's supervisor during her employment. Bart Scott, CFO and COO at BWY, was Sexton's direct supervisor at BWY for a period of time, as was Bryant Banks, the Vice President of BWY. Sexton maintains that, beginning in June of 1996 and continuing through her termination, she was subjected to various forms of sexual abuse by Terry Young. The abuse allegedly took the form of direct requests for sex, unwanted sexual advances, sexually explicit comments, descriptions of sexually explicit dreams Young had about Sexton and Young's exposure of himself to Sexton at a company party.

Sexton claims that Young's inappropriate behavior first began at a company boat party, when he allegedly approached her while the two were alone waiting to use a restroom and began discussing having sex with her. Young's advances were, according to Sexton's account, thwarted by the appearance of Bryant Banks. Sexton later thanked Banks for having "saved" her, and he allegedly acknowledged having done so. During the same boat party, Young allegedly rubbed against Sexton's chest as the two passed on the deck of the boat and told Sexton that he wanted to unbutton her dress, which buttoned down the front, with his teeth. Sexton contends in her response brief that this touching was intentional.

According to Sexton, the day after the initial incident, Young called her into his office and told her that he remembered having asked to have sex with her at the party and reiterated his desire to do so. Following the boat party, Young started to take Sexton on business trips involving subject matter and issues that she had not previously been involved in. Young also began to periodically take Sexton and another female employee of BWY, Anna Higgins, to lunch. The trio went out to lunch at least a half dozen times over a period of two months. Sexton claims that, during the lunch outings, Young always talked about sex. Young, according to Sexton, asked both during a lunch outing and during a company party, to film Sexton and Higgins having sex.

Sexton maintains that Young described several sexually explicit dreams to her. The dreams allegedly involved Young and Sexton performing various sexual acts on one another. Further, Sexton claims that Young subjected her to daily sexual comments, such as stating that if the two went on a trip together, he wanted to get adjoining rooms. Young would allegedly call Sexton to his office to examine what she was wearing, speak to her with sexual undertones, and watch her walk back to her department. Young also accompanied Sexton several times to her car as she left work, and, at least twice, suggested

-3-

that he wanted to have sex with her. Sexton also complains that Young exposed himself to her and a number of BWY employees at the company's Fall party in 1996. At that party, Young "mooned"the entire company. Sexton states that he "pulled his pants down and showed his bottom to everybody... except for me [Sexton] because I was standing in front of him when he did it... [I saw] his sexual organs." Sexton has testified that incidents of sexual abuse such as those described above continued from the initial incident at the boat party in the summer of 1996 until she was fired in October of 1997.

Sexton alleges that Bryant Banks, at some point, noticed Young's irregular behavior and conveyed his concern to Sexton that Young harbored sexual feelings toward her. Sexton claims that she told Banks that she hoped the situation would just go away. Banks apparently took no action to remedy the situation. Sexton alleges that this was the second time, including the boat party incident, that Banks had made his recognition of the situation clear, and that she therefore concluded that he could not and/or would not provide her with aid in the matter. Sexton maintains that she never made any formal complaint to Banks following this incident because of his failure to respond to the problem in any way. Sexton also claims to have discussed specific incidents involving Young's inappropriate behavior with Bart Scott, but states that such complaints were only made at a personal level. According to Sexton, all of the officers at BWY and Weaver Insurance knew of Young's propensity to conduct himself in a sexually harassing manner because of the mooning incident and because of another EEOC claim filed by Rhonda Carr, the former Vice President of finance at BWY. Both Sexton and Ms. Carr have testified that they did not feel that they could effectively complain about Young's behavior to anyone in the company, because of the futility of such complaints.

Sexton claims that she never received a copy of the BWY sexual harassment policy, and that she never saw or heard of the policy prior to the summer of 1997. Prior to 1997, according to Sexton and Janice Jackson, who was in the Micro-Auditing department at BWY, there existed no procedure for filing complaints of sexual harassment at BWY. Defendants, however, claim that the policy took effect in September of 1996 and was distributed to all employees. Defendants also point to Sexton's deposition testimony, in which she acknowledged that, prior to the instigation of the policy, she knew she could make complaints to Young, Banks or Bart Scott and that she felt comfortable doing so. Finally, defendants

-4-

emphasize that, even when the policy was instigated and Sexton was aware of the procedures, she never made any effort to lodge a formal complaint against Young.

Sexton testified in her deposition that she was offended by Young's conduct and that his advances were unwelcome and unwanted and that he continued to pursue her despite her wishes. Sexton also maintains that, following her rejection of Young's advances, Young began to strip her of her managerial responsibilities and exclude her from transactions and meetings which she, as manager of her department, should have been involved with and, if not for her rejection of him, would have been involved with. Sexton contends that Young attempted to drive her out of the office. According to Janice Jackson, Young told several employees that he did not intend to fire Sexton, but that he would "make life so miserable that she would want to quit."

On September 9, 1997, Young presented Sexton with a letter outlining a number of complaints he had about her performance, productivity and managing effectiveness. Young requested that she sign the letter to acknowledge her understanding of the issues addressed, but Sexton refused, claiming that the allegations within the letter were patently false. Sexton testified that Young "gave [the letter] to me and said, well, then we'll just forget it - you take it." Approximately a month and a half later, Young terminated Sexton's employment, based on the claim that the problems outlined in the letter had not been remedied. Although Young now maintains that he told Sexton that she was terminated because of her job performance, citing her attitude, the sexually charged atmosphere of her department, the existence of an on-going feud between Sexton and another employee, his concern that she was releasing confidential information to people outside the office, and her overall productivity, Sexton believes that her termination was the result of her refusal to have sex with Young and her decision to file a complaint with the EEOC. She also contends that Young, in terminating her, never told her that she was being fired for the various reasons he now articulates, but simply told her that her attitude was poor, that it had not improved, and that she was, therefore, terminated. According to Sexton, her job performance did not change in the months preceding her termination and she did nothing to compel the termination except reject Young. She claims that she was a productive and effective employee, and points to the deposition testimony of Bryant Banks and Rhonda Carr who both depict her as a good employee.

Sexton contends that Young knew of the EEOC charges because two employees of BWY told Sexton that Young had told them that he knew of the claim. Young claims not to have known about the EEOC claim until well after Sexton was fired and maintains that Sexton has provided no admissible evidence of such knowledge. Defendants have filed a Motion to Strike Sexton's allegations regarding the employees' alleged statements, because they represent inadmissible hearsay. Sexton has provided no additional evidence of Young's knowledge of the EEOC claim at the time of Sexton's termination.[2]

### B. Defendants

Defendants allege, based on the testimony of several BWY employees, that Sexton was the source of the sexually charged atmosphere in the Insurance department at BWY and that she regularly conducted herself in an unprofessional manner when in the office. According to defendants' witnesses, Sexton regularly made sexual jokes and comments to persons in the office and wore inappropriate clothing to work. Sexton showed at least one employee at BWY her tatoo, which is located somewhere near her pubic region. Defendants also claim that she told Kent Back, an employee of Weaver Insurance who had an office at BWY, that she and her husband had sex at the office after hours and that she wore garter belts. She also allegedly asked Mr. Back about his wife's lingerie, made sexual comments about candy that she kept at her desk, and made sexually-related comments about Terry Young. Sexton claims to have conducted herself as a professional while working for BWY. However, she admits to having had an extra-marital affair with her married supervisor, Bart Scott, while both were working for BWY. Sexton has also not denied having told Banks about her tatoo and its location, having allowed a male "hunk' calendar to remain posted in the office, having made vulgar comments and jokes, or having allowed and condoned women in the front office showing tatoos on their hip and upper thigh to men in the office.

### III. Title VII Claims

#### A. Claim(s) Against Young as an Individual

Defendants' Summary Judgment Motion deals, first, with Sexton's Title VII claim(s) against Young. According to Busby v. City of Orlando, 931 F.2d 764 (11th Cir. 1991), "the relief granted under Title VII

---

[2] As to this alleged evidence, see recorded discussion of November 3, 1998.

is against the employer, not individual employees whose actions would constitute a violation of the law."
931 F.2d at 772; See also Smith v. Capitol Club of Montgomery, 850 F.Supp. 976, 978 (M.D.Ala. 1994);
Saville v. Houston County Healthcare Authority, 852 F.Supp. 1512 (M.D.Ala 1994); cf. Wilson v. Gillis
Advertising Company, 1993 WL 503117 (N.D.Ala. 1993) (holding that the 1991 Amendments to Title VII
overruled Busby – the previous two cases expressly disagree with the holding in Wilson as do most of the
courts that have examined Judge Acker's reasoning in that case). Defendants thus assert that the Title VII
claim(s) against Young are due to be dismissed. The court agrees and plaintiffs admit that these claims are
due to be dismissed.

### B. Retaliation Claim

Defendants claim that Sexton has provided no evidence supporting the allegation that she was
retaliated against for filing an EEOC charge. Defendants stress that Young explicitly stated in his
deposition testimony that he was unaware of the EEOC charge at the time of Sexton's termination and that
Sexton has provided no admissible evidence to refute his claim. Under Saville, a plaintiff, in order to
establish a prima facie case of retaliation under Title VII, must show: (1) participation in actions protected
by the statute; (2) an adverse employment action; and (3) a casual link between the protected actions and
the adverse employment decision. 852 F.Supp. at 1528. To establish a casual link, there must be a
"protected expression" and "[a]t a minimum, a plaintiff must establish that the employer was actually
aware of the protected expression at the time it took adverse action." Quillen v. American Tobacco
Company, 874 F.Supp. 1285, 1294 (M.D.Ala. 1995). Defendants argue that Sexton does not have a claim
for retaliation because, at the time of her firing, the company had nothing to retaliate for. She had made no
formal complaints and Young claims not to have known of the EEOC charge until well after Sexton was
terminated. Sexton's only evidence to refute Young's testimony is her own testimony based on what
Higgins allegedly heard Young say. Again, defendants have filed a motion arguing that Sexton's testimony
about what Higgins told her Young said is not admissible at trial and should not be considered in deciding
whether summary judgment should be granted.

Defendants claim that even if Sexton could establish a prima facie case of retaliatory discharge, her
claim would fail because Young had legitimate grounds for terminating her employment. Under Quillen,

"[o]nce the plaintiff establishes a prima facie case, the burden shifts to the employer to rebut it by articulating clearly and specifically a legitimate, non-discriminatory reason for its adverse employment action." Id. "This is a burden of production, not persuasion." Id. "This established, the burden shifts back to the plaintiff to present some evidence to create an issue of fact as to whether the proffered reason was pretextual and the real reason was discriminatory." Id. Defendants aver that the reasons for firing Sexton were non-pretextual and that plaintiff has not rebutted the bulk of the non-discriminatory reasons for termination outlined by Young in his September 1997 letter to Sexton and cited by Young when Sexton was fired.

Sexton, however, argues that the evidence provided in support of her Opposition to Motion for Summary Judgment sufficiently establishes a prima facie case of retaliation and that defendants have not elucidated legitimate reasons for having terminated her employment. Sexton claims that, by rejecting Young's advances, she engaged in protected opposition to Title VII discrimination and that she participated in a Title VII proceeding by filing her EEOC charge against the defendants. Sexton, as stated above, contends that she was fired because of her refusal to have sex with Young. She claims that, 30 minutes after firing her, Young told BWY employees that she had been terminated because she filed an EEOC claim (again, however, Sexton has presented no admissible evidence to support her contention). Based on her belief that Young knew of the EEOC claim, Sexton claims to have established a prima facie case for retaliatory discharge.

Sexton claims that Young's purported reasons for terminating her employment are based on false assertions about her work habits and about the working conditions in her department. She points to Young's deposition testimony, in which he stated that he did not hold her individually responsible for the environment in her department, could not articulate any confidential information she had divulged to persons outside the company, and acknowledged that she was dealing with and staying current with a greater number of accounts and receivables than other BWY employees doing the same type of work. Young also claimed that Sexton was involved in an ongoing feud with another employee at BWY, Patricia Robinson, a claim denied by both Sexton and Robinson. Given Young's testimony, the fact that Sexton maintains that Young did not articulate most of the alleged reasons for her termination when she was fired,

and the fact that Sexton believes she was fired for having filed an EEOC claim and refused requests for sex, Sexton claims that the parties have alleged facts that are sufficiently contradictory to warrant submission to a jury.

Sexton argues that BWY is vicariously liable for Young's behavior under the reasoning of Faragher v. City of Boca Raton, 1998 WL 336322 (U.S. 1998). In Faragher, the Court held that:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages. . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion or undesirable reassignment.

Id. at *19.

### C. Quid Pro Quo Sexual Harassment

Defendants contend that Sexton's allegations do not constitute quid pro quo sexual harassment. In Burlington Industries, Inc. v. Ellerth, 1998 WL 336326 (U.S. 1998), the Court held:

> We do not suggest the terms quid pro quo and hostile work environment are irrelevant to Title VII litigation. To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general, the terms are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII. When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, the conduct must be severe or pervasive.

Id. at 8.

According to the 11th Circuit's opinion in Farley v. American Cast Iron Pipe Co., 115 F.3d 1548 (11th Cir. 1997):

> [Q]uid pro quo sexual harassment occurs when the employee's reaction to harassment complained of affects tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment.

Id. at 1550. Defendants point out that the facts of Farley are similar to this case. In Farley, the plaintiff worked as a dental assistant at the pipe company while Dr. Gann worked as a dentist there. Id.

According to plaintiff, Gann subjected her to unwelcome sexual advances and remarks . . . Farley testified that Gann communicated to her erotic dreams he had had about her, kissed her over her objections, told jokes of a sexual nature in her presence, made sexually explicit remarks about her body, and deliberately caused her to trip and fall so he could pick her up and spin her around.

Id. Regarding plaintiff's claim for quid pro quo sexual harassment, the court held: "Here, the record does not contain substantial evidence that Gann demanded [plaintiff's] acquiescence to his sexual overtures in exchange for a tangible job benefit." Id. Defendants contend that the present situation is similar to Farley in that Young is not alleged to have conditioned any sort of job benefit or detriment on Sexton's giving in to his desires.

## D. Hostile Work Environment

Defendants argue that Sexton cannot maintain her claim for Title VII hostile work environment because the environment in the workplace at BWY was not subjectively hostile to her and argues that the court may decide this as a matter of law. According to Fleming v. Boeing Company, 120 F.3d 242 (11th Cir. 1997):

Hostile environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment.' Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." The harassing conduct must create both an objectively hostile or abusive environment – one "that a reasonable person would find hostile or abusive" – and a subjectively hostile or abusive environment – one that the victim . . . subjectively perceives . . . to be abusive." [citations omitted].

Id. at 245. Defendants contend that Sexton's behavior in the office indicates that the atmosphere that may have been created by Young's alleged actions could not have been subjectively hostile to her in that she instigated and participated in creating the sexually hostile environment at BWY. Defendants claim that her sexually suggestive comments and jokes, participation and instigation of vulgar conversations, displaying of lingerie to other employees, questions regarding other employees' sex lives, and her actions of showing the tatoo on her pubic area to co-workers indicate that she was not offended by such conduct in the workplace and that the environment at BWY was not troubling to her.

Sexton, however, claims that she has adequately established a prima facie case of hostile work

environment.  She cites <u>Quillen</u>, *supra*, for an outline of the elements necessary to make a case for sexual

harassment.  According to the <u>Quillen</u> court, a plaintiff must show:

> (1) that the employee belongs to a protected group;
> (2) that the employee was subject to unwelcome sexual harassment;
> (3) that the harassment complained of was based on sex;
> (4) that the harassment complained of affected a term condition or privilege of employment in that
> it was sufficiently severe or pervasive to alter the conditions of employment and create an abusive
> work environment; and
> (5) that the employer knew of the problem, and failed to take prompt remedial action.

<u>Quillen</u>, 874 F.Supp. 1285, 1293.  Sexton claims to have satisfied each of these elements.  She belongs to a

protected group in that she is a woman, and has testified as to Young's alleged sexual comments, desires,

suggestions and advances focused on her.  She has also asserted that Young's behavior was unwelcome and

personally offensive to her, and claims to have shown that the environment created by Young's behavior

was abusive and hostile.  Sexton contends that genuine issues of material fact exist as to whether a

reasonable person would find Young's actions and words sufficiently severe and pervasive to create an

abusive working environment.  Finally, Sexton claims to have established that Young, Banks, and Scott all

knew of the ongoing sexual harassment being focused on Sexton by Young and that each failed to take any

remedial action.  Thus, Sexton argues that she has established each of the elements required to sustain a

Title VII hostile work environment claim.

    Sexton notes that the only argument in favor of summary judgment on the hostile work

environment claim provided by the defendants is that the environment was not subjectively hostile to

Sexton.  Sexton denies having participated in the conduct described by defendants and claims that she

found the environment at BWY hostile and offensive.  She thus contends that there remain genuine issues of

material fact with respect to the issue of whether the work environment was subjectively hostile to her and

calls for the denial of the summary judgment motion with respect to the count for Title VII hostile work

environment.

**IV.  State Law Claims**

### A.  Alabama Workers' Compensation Act

    Under <u>Reid v. Aetna Casualty & Surety Company, et al.</u>, 692 So.2d 863, 864 (Ala.Civ.App.

1997), and Gibson v. Southern Guaranty Insurance Company, 623 SO.2d 1065. 1066 (Ala. 1993), the

exclusivity provision of the Alabama Workers' Compensation Act generally provides the exclusive remedy

for an injured worker's claims against the worker's employer, the employer's workers' compensation

insurer, and the carrier's agents. Defendants cite Jones v. Colonial Bancgroup, 1998 Ala. Civ.App. LEXIS

210 (March 13, 1998), to support their contention that the exclusivity provision bars all claims except

tortious claims based on intentional conduct by BWY or its employees. In Jones, the plaintiff sued for

assault and battery and loss of consortium against her supervisor and later amended her complaint to

include claims for invasion of privacy and outrage. The trial court granted summary judgment on all

claims based on the exclusivity provision. The appellate court reversed the granting of summary judgment

on the invasion of privacy claims, but did not revisit the trial court's dismissal of the battery claim.

Defendants argue that Jones supports the contention that BWY cannot be held liable for Young's

intentional tortious behavior, and state that Waldon v. Hartford Insurance Group, 435 So.2d 1271 (Ala.

1983), stands for the principle that Sexton's negligence claims against BWY are barred. Defendants thus

argue that, under Waldon, and Busby v. Truswal Systems Corp., 551 So.2d 322, 324 (Ala.1989), only the

invasion of privacy and intentional infliction of emotional distress claims should survive application of the

exclusivity provision. Defendants claim that, with respect to her other state claims, Sexton is allowed a

workers' compensation claim and nothing else.

     Sexton contends that, because Young's behavior was intentional, and because BWY's negligent

supervision of Young was not accidental, none of her claims are barred by the Alabama Workers'

Compensation Act. In Busby v. Truswal Systems Corp., 551 So.2d 322 (Ala. 1989), the court held that:

> Both §25-5-52 and §25-5-53 immunized employers from tort liability when an employee is injured
> during his employment due to an "accident." "Accident is defined in Ala Code 1975, §25-5-1(8),
> as "an unexpected or unforeseen event, happening suddenly and violently, with or without human
> fault, and producing injury to the physical structure of the body or damage to an artificial member
> of the body by accidental means."

Id. at 325. Sexton thus argues that the defendants' contention that the Workers' Compensation Act applies

only to intentional torts is a mischaracterization of the law. She states that BWY's failure to supervise

Young was not accidental in that BWY officers knew of the situation and took no steps to alleviate the

problem. Sexton therefore claims that the Workers' Compensation Act does not bar her negligent supervision action. Although she says nothing about her battery claim, one could assume that her argument regarding the exclusivity provision's applicability to that claim would be similar to the that presented above, although such argument would apparently disregard the outcome in Jones.

### B. Invasion of Privacy

As defined by the Alabama Supreme Court, the tort of invasion of privacy is the "wrongful intrusion into one's private actions in such a way as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." Nipper v. Variety Wholesalers, Inc., 638 So.2d 778, 791 (Ala. 1994). Invasion of privacy encompasses four separate "wrongs": "(1) intrusion upon the plaintiff's physical solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false but not necessarily defamatory position in the public eye; and (4) the appropriation of some element of the plaintiff's personality for a commercial use." Phillips v. Smalley Maintenance Servs., Inc., 435 So.2d 705, 708 (Ala.1983). Complaints of sexual harassment may sufficiently state a claim for invasion of privacy. Busby, 551 So.2d at 324; Phillips, 435 So.2d at 711. In Busby, a plant supervisor engaged in severe and pervasive sexual harassment that included obscene and sexually suggestive remarks, gestures, and propositions, as well as physical contact with the plaintiffs. 551 So.2d at 324. The Busby court found the supervisor's conduct sufficient for the plaintiffs to state a claim for invasion of privacy. Id. In Phillips, the Alabama Supreme Court answered a certified question from the Eleventh Circuit in a case where the defendant engaged in physical conduct including "[striking the plaintiff] across the buttocks with his hand," as well as questioning a female employee several times a week about the employee's sexual experiences. The court had "no hesitancy" in concluding that the defendant's conduct constituted an invasion of privacy. Phillips, 435 So.2d at 711. In Brassfield v. Jack McLendon Furniture, Inc., 953 F.Supp. 1438 (M.D.Ala.1996), the court outlined Alabama caselaw concerning invasion of privacy in sexual harassment cases:

> Here, the plaintiffs are claiming that the defendants wrongfully intruded in their privacy, physical solitude, or seclusion. The Hogin Court elaborated on a wrongful intrusion claim: '[T]here must be something in the nature of prying or intrusion' and 'the intrusion must be something which would be offensive or objectionable to a reasonable person. The thing into which there is intrusion or prying must be, and be entitled to be, private.' Two primary factors are

considered in 'determining whether or not an intrusion which effects access to private information is actionable. The first is the means used. The second is the defendant's purpose for obtaining the information.' 553 So.2d at 531 (citations omitted). The Court notes that the inquiry in an invasion of privacy claim is similar to that made in an outrage claim. When evaluating an outrage claim a court asks whether the defendant's conduct was "extreme and outrageous," while when considering an invasion of privacy claim, the court determines whether the defendant has made a "wrongful intrusion into one's private activities in such manner so as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities." Hogin, 533 So.2d at 530-31. While conduct needed to support an invasion of privacy claim need not be "extreme and outrageous," in cases where a viable claim for invasion of privacy exists, the defendant's behavior frequently approaches such a degree. Compare Busby (factors supporting invasion of privacy claim supported outrage claim) with Carter v. Innisfree Hotel, Inc., 661 So.2d 1174 (Ala.1995) (facts supported invasion of privacy claim premised on wrongful intrusion but not outrage claim).

Four cases decided by the Alabama Supreme Court supply this Court with a roadmap for determining whether comments and questions of a sexual nature are sufficiently outrageous to support a claim for invasion of privacy. Busby represents one end of the spectrum – extreme and outrageous sexual harassment will support an invasion of privacy claim. In Phillips v. Smalley Maintenance Services, 435 So.2d 705 (Ala.1983), the court did not address the viability of an outrage claim, but found that an action for invasion of privacy would lie where: (1) the employer questioned a female employee two or three times a week for period of three months behind "locked doors" about the employee's sexual experiences; (2) the employer later made coercive sexual advances towards employee; and (3) whereupon the employee suffered severe mental trauma. However, in McIsaac v. WZEW-FM Corp., 495 So.2d 649, 650 (Ala.1986), although an employer repeatedly asked a female employee to "be available," tried to kiss her several times and later attempted to have her fired for resisting his advances, the court found that the plaintiff/employee had failed to establish a viable invasion of privacy claim. Finally, in Logan v. Sears, Roebuck & Co., 466 So.2d 121, 123-24 (Ala.1985), the court held that the defendant's statement that the plaintiff was as "queer as a three dollar bill" was not outrageous enough to maintain an invasion of privacy claim.

Id. at 1455-56.

Defendants contend that the present situation is akin to that depicted in McIsaac and that,

therefore, even if Sexton's allegation are true, the conduct complained by Sexton does not amount to

invasion of privacy. Defendants claim that the behavior complained of in Busby[3] and Phillips was

_____

[3] In Busby, the plaintiff (Busby) presented evidence that the defendant:

(1) invited Busby to swim in his pool in the nude with him; (2) told Busby that his hands were cold and asked if he could put them in her pockets to keep them warm; (3) told the plaintiffs that he would "put a stick on their machines" so they could masturbate while working; (4) said that he could perform intercourse as fast as one of the machines at the plant could operate; (5) said that he wished that the plaintiffs would come to work braless and wear less clothing; (6) told one of the plaintiffs that if she had not stayed up all night having sex she could do her work properly; (7) told one employee that if she would give him 30 minutes with her that he would fill her pants in nine months for her; (8) acted as if he was going to pinch one plaintiff's breasts with a pair of pliers

-14-

substantially more violative and intrusive than the conduct Sexton has described and that those cases are not applicable to the facts in this case.

Sexton, however, argues that Young's alleged acts of describing his sexual dreams to her, his numerous requests for sex, his rubbing up against her chest, his act of exposing himself to her, his request to video Sexton having sex with another employee, his ceaseless comments about her appearance, and his continual sexual comments to Sexton over a period of a year and a half constitute intentional intrusions to her private life, both physical and mental, to constitute an invasion of privacy.  Sexton compares her claims to those discussed in Busby, and claims that the severity of Young's alleged behavior surpasses the egregiousness of the conduct exhibited by the supervisor in Busby.  She, therefore, concludes that the defendants' motion for summary judgment on the invasion of privacy claim should be denied.

## C. Intentional Infliction of Emotional Distress (Outrage)

Sexton claims that Young's alleged conduct is clearly extreme and outrageous.  She also claims to have suffered considerable emotional distress and physical ailment, in the form of arthritis and an ulcer disease, as a result of Young's conduct.  Sexton points to Cunningham v. Dabbs, 1997 WL 99728 (Ala.Civ.App. 1997), where the court, quoting the Alabama Supreme Court's decision in American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1981), held that "[o]ne who by extreme and outrageous conduct intentionally, recklessly causes emotional distress to another is subject to liability."  Young's conduct, according to Sexton, arguably reaches the level of an invasion of privacy as described in Cunningham and

_____

and with his hands;  (9) said that he should send one of the plaintiffs across the street to where a group of men were standing because she stayed sexually aroused all of the time;  (10) told one of the plaintiffs that he was very tired and asked her if she would accompany him to the restroom and hold his penis while he urinated;  (11) told one of the plaintiffs that her nipples were as large as another employee's entire breasts;  (12) attempted to follow one of the plaintiffs into the restroom and when she asked him where he was going, said that he was going to help her; (13) followed one of the plaintiffs one night;  (14) said that a table in his office had been damaged when one of the plaintiffs and a male co-employee had sex on top of it;  (15) openly stared at the plaintiffs' sexual anatomy;  (16) put his arm around the plaintiffs, grabbed their arms, and stroked their necks;  and (17) made other lewd remarks and gestures to the plaintiffs.

Busby, 551 So.2d at 324.  The court then concluded that, "[a] jury could reasonably determine from this evidence that [defendant] pried or intruded into the plaintiffs' sex lives in an offensive or objectionable manner and thereby invaded their right of privacy.  Id.

Inmon and, as in Quillen v. American Tobacco Company, creates an issue of material fact that should be submitted to a jury.

The defendants, in arguing in favor of summary judgment on the intentional infliction of emotional distress claim, rely on additional language used by the Alabama Supreme Court in Inmon. After holding that extreme and outrageous conduct and emotional distress were the required elements for such a claim, the Inmon court stated that "the emotional distress thereunder must be so severe that no reasonable person could be expected to endure it.... By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Inmon, 394 So.2d at 365. The court further held that conduct characterized by "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" is not actionable as outrageous conduct. Id. at 367-68. The defendants again relate this case to McIsaac, in which the court held that the supervisor's behavior did not extend beyond the trivialities described by the Inmon court. Similarly, defendants characterize the facts in Busby as considerably more offensive and blatant than those presented by Sexton, and argue that Busby is easily distinguished from the present case.

### D. BWY's Liability for Young's Intentional Torts

Defendant, citing Ex parte Atmore Hospital, 1998 LEXIS 174 (Ala. 1998), states that "[a]n employer is liable for the intentional torts of its employees if: (1) the employee's acts are committed in the furtherance of the business of the employer; (2) the employee's acts are within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the tortious acts." Id. at *8.

> [The Supreme Court] has stated that tortious acts furthered an employer's business where, for example. A defendant undertaker refused to release the body of the plaintiff's husband until the plaintiff had paid for the services rendered. Levite Undertakers Co. v. Griggs, 495 So.2d 63 (Ala. 1986), and where the defendant used threatening or abusive behavior in attempt to coerce the plaintiff into dropping his claim. National Security Fire & Casualty Co. v. Bowen, 447 So.2d 133 (Ala. 1983). In contrast, where a co-employee defendant's behavior is aimed at "satisfying [the co-employee's] own lustful desires," this Court has held that "no corporate purpose could conceivably be served." Busby, 551 So.2d at 327.

Id. at *6. In Atmore, the plaintiff

> presented evidence indicating that [the defendant] touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg. [Plaintiff] also presented evidence indicating that each of the touchings was intentional, was

conducted with sexual overtones, and was unwelcome.

Id. at *7. The court held that the plaintiff's evidence of the alleged battery and invasion of privacy showed that the defendant-employee's conduct was entirely personal in nature and not within his assigned duties. Defendants argue that Young's alleged behavior and motivation in this case is identical to that described in Atmore and that BWY is, therefore, not liable for the intentional torts that Young may have committed.

Sexton first looks to Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1558 (11th Cir. 1987), to dispute defendants' contentions regarding BWY's liability for Young's actions. According to Sparks, "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment," and "for the torts of his servants acting outside the scope of their employment where: (d) the servant purported to act or speak on behalf of the principal and there was reliance on apparent authority, or he was aided in accomplishing the tort by the existence of the agency relationship." Id. at 1558-59.

Sexton claims that Young was acting within the scope of his employment as President of BWY when he sexually harassed her and, in doing so, stresses that each instance of harassment occurred at BWY or at a BWY-sponsored event. Sexton argues, however, that even if Young was not acting within the scope of his employment, that BWY is liable for his actions by virtue of the fact that Young was aided in accomplishing his tortious acts by the existence of the agency relationship. The Supreme Court's language in Faragher v. City of Boca Raton, 1998 WL 336322 (U.S. 1998), according to Sexton, further supports her contention. In Faragher, the Court stated:

> [I]n implementing Title VII it makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority, and that the aided-by-agency-relation principle embodied in §219(2)(d) of the Restatement provides an appropriate starting point for determining liability for the kind of harassment presented here. Several courts, indeed, have noted what Faragher has argued, that there is a sense in which a harassing supervisor is always assisted in his misconduct by the supervisory relationship.

Id. at *17. Sexton claims that Young's position as her supervisor clearly facilitated his tortious conduct and argues that Faragher stands for the principle that persons in her position should be able to recover from the employer.

### E. Battery

Defendants contend that even if Sexton's battery claim survives the exclusivity provision of the

Workers' Compensation Act and the Atmore-based argument, she will, nonetheless, fail on the merits and, therefore, fail in her claims against both Young and BWY. The Alabama Supreme Court has outlined the definition of assault and battery, holding that an assault is "[a]n intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt if not to prevent it." Wright v. Wright, 654 So.2d 542, 544 (Ala. 1995). "A successful assault becomes a battery which consists of a touching of another in a hostile manner." Id. Defendants claim that Sexton has failed to support her claim for battery in that she has not alleged an intentional touching. However, Sexton has characterized Young's rubbing against her at the boat party as intentional and offensive. Sexton thus contends that a genuine issue of material fact exists with respect to her battery claim.

### F. Negligent Supervision

In Ledbetter v. United American Insurance Co., 624 So.2d 1371 (Ala. 1993), the Alabama Supreme Court discussed the plaintiff's burden of showing knowledge on the part of an employer to overcome a motion for summary judgment in negligent supervision cases:

> To avoid summary judgment on [a] negligent supervision claim against an employer for harm done . . . by its former employee, [plaintiff] must show or demonstrate that [the employer] had notice or knowledge (actual or presumed) of [the employee's] alleged incompetency . . . demonstrating liability on [the employer's] part requires affirmative proof that [the employee's] alleged incompetence was actually known to [the employer] or was discoverable by [the employer] if it had exercised care and proper diligence.

Id. at __.

Defendants state, again, that even if the exclusivity provisions of the Workers' Compensation Act did not bar the plaintiff's claim for negligent supervision, the claim would fail on the merits. Neither the BWY Board of Directors, nor the Board of Directors for Weaver Diversified Insurance had any knowledge of any improper conduct by Young, according to Jerry Weaver, a member of both boards. Thus, defendants maintain that Sexton's negligent supervision claim fails. Sexton, however, claims to have shown that the officers and directors of BWY knew of the harassment. She maintains that both Banks and Scott, two officers of the company knew and that Weaver knew of Young's tendency toward sexually

inappropriate behavior by virtue of the "mooning" incident at the company party – an incident Young claims he was verbally reprimanded for by Weaver.  Sexton claims that, despite this knowledge, Weaver and the board members made no effort to reprimand Young in writing or to impose any negative consequences on him for his inappropriate actions.  She, thus, concludes that there remain genuine issues of material fact concerning the negligent supervision claim.

### G. Breach of Contract

Sexton does not oppose defendants' motion for summary judgment with respect to her breach of contract claim.  The claim will, therefore, be dismissed.


## V. Court's Conclusions

As agreed, the individual Title VII claim(s) against Young are due to be dismissed.  The court will also dismiss the Title VII retaliation claim because there is no admissible evidence that Young knew of the EEOC charge when he terminated the plaintiff's employment.  See recorded discussion of November 3, 1998.  The court will deny the motion as to the Title VII claims against BWY.

The court will dismiss the outrage and invasion of privacy claims.  See McIsaac v. WZEW-FM Corp., 495 So.2d 649 (Ala.1986).  The court reserves judgment on the issues relating to Workers' Compensation and the employer's liability for intentional torts.  Within 15 days the defendants will submit excerpts from Alabama cases and statutes which they claim support their positions.  The plaintiff may submit any counter excerpts within 10 days thereafter.

This ___ day of November, 1998.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE